# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELUID CAMPOS JR.,<br><br>Defendant. | Case No. **25-mj-05494-SBC**<br><br>COMPLAINT FOR VIOLATION OF<br><br>Title 18, U.S.C., § 922(a)(1)(A) – Dealing and Manufacturing Firearms Without a License; Title 18, U.S.C., § 922(o) – Possession/Transfer of a Machinegun; Title 21, U.S.C., § 841(a)(1) and (b) – Distribution of Fentanyl; Title 21, U.S.C., § 841(a)(1) – Distribution of Cocaine |

The undersigned complainant, being duly sworn, states:

### Count 1

Beginning on or about December 5, 2024 and continuing until on or about August 25, 2025, within the Southern District of California, defendant ELIUD CAMPOS JR., not being a licensed dealer or manufacturer of firearms within the meaning of Title 18, United States Code, Chapter 44, did knowingly and willfully engage in the business of dealing firearms in violation of Title 18, United States Code, Section 922(a)(1)(A).

1

## Count 2

On or about January 30, 2025, within the Southern District of California, defendant ELIUD CAMPOS JR. did knowingly and intentionally possess a machinegun, and was aware of the essential characteristics of that machinegun under Title 18 United States Code Section 921(a), to wit: a Glock conversion device; in violation of Title 18, United States Code, Section 922(o).

## Count 3

On or about January 30, 2025, within the Southern District of California, defendant ELIUD CAMPOS JR. did knowingly and intentionally distribute 400 grams and more, to wit, approximately 501.29 grams of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) and (b).

## Count 4

On or about May 7, 2025, within the Southern District of California, defendant ELIUD CAMPOS JR. did knowingly and intentionally distribute 40 grams and more, to wit, approximately 384.1 grams of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) and (b).

## Count 5

On or about May 14, 2025, within the Southern District of California, defendant ELIUD CAMPOS JR. did knowingly and intentionally distribute 400 grams and more, to wit, approximately 518.9 grams of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) and (b).

## Count 6

On or about May 14, 2025, within the Southern District of California, defendant ELUID CAMPOS JR. did knowingly and intentionally distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance: in violation of Title 21, United States Code, Section 841(a)(1).

## Count 7

On or about August 25, 2025, within the Southern District of California, defendant ELUID CAMPOS JR. did knowingly and intentionally distribute 400 grams and more, to wit, approximately 825.8 grams of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) and (b).

The complainant states that this complaint is based on the attached Statement of Facts, incorporated herein by reference.

*Amanda Renteria*
Amanda Renteria
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 8th day of October, 2025.

HONORABLE STEVE B. CHU
United States Magistrate Judge

3

**Training and Experience**

I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives and have been since September 2020. I have been trained in the Federal Law Enforcement Training Center under the following programs: Criminal Investigator Training Program and Special Agent Basic Training.

As an ATF Special Agent, I have received training in federal firearms and controlled substances laws and have been the affiant on search and arrest warrants for such violations, to include investigations of persons prohibited from possessing firearms, dealing firearms without a license, violations of the National Firearms Act, and distribution of controlled substances. In these areas, among other duties and experience, I have authored probable cause statements for complaints along with affidavits for search warrants which have yielded evidence of federal criminal violations. Through my training, education, and experience, I have become familiar with, among other things, the ways in which members of a criminal enterprise communicate, contact each other, and use electronic communications to store, transmit, and distribute information to one another and how they plan, organize, and carry out their criminal activities. I have also become familiar with the movements of individuals trafficking illegal drugs and weapons and those suspected of committing violent crimes and trafficking in illegal drugs and weapons, among other things.

Before my employment with ATF, I was a U.S. Border Patrol Agent, beginning in 2007. I attended the US Border Patrol Academy in Artesia, New Mexico, for approximately 26 weeks and have additional specialized training and experience relating to fugitive tracking and apprehension.

The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training

1

and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause, it does not set forth every fact that I or others have learned during the investigation.  All dates and times herein are approximate.

### **Facts Supporting Probable Cause**

In October 2024, ATF San Diego began investigating CAMPOS. ATF received information that CAMPOS was distributing firearms and illicit narcotics in San Diego County. Specifically, a Confidential Informant (CI-1)[1] indicated that CAMPOS was distributing cocaine, fentanyl and firearms in the Chula Vista area of San Diego County.

### **Controlled Purchase of Firearms on December 5, 2024**

On December 5, 2024, agents with ATF and the San Diego Police Department (SDPD) conducted an undercover operation. Shortly before that date, CAMPOS arranged to sell firearms to CI-1. CAMPOS and CI-1 agreed to meet outside of CAMPOS' residence to complete the transaction. Upon arrival, CAMPOS greeted CI-1 and entered the apartment building through a side door while CI-1 remained in his/her vehicle. Shortly after, surveillance units observed CAMPOS exit the apartment building holding a large black bag. At that time, CAMPOS sold the CI one Romarm/Cugir model: WASR-10, a 7.62 caliber rifle bearing serial number A1-80858-20 ROA; one North China Industries model: SKS, 7.62 caliber rifle bearing serial number 10254582A; and one Aero Precision model: M16A4, 5.56 caliber rifle bearing serial number 00012004 for $7,100.

---

[1]     CI-1 has worked with ATF on multiple prior occasions, providing information that led to the discovery of firearms and/or controlled substances at specific locations, and in the possession of individuals CI-1 identified. ATF and other agencies have determined that information previously provided by CI-1 was reliable. To my knowledge, CI-1 has never given ATF or other agencies misleading or false information. Nor do we have reason to doubt the reliability of the information provided by CI-1. CI-1 has prior criminal convictions related to possession of controlled substance for sale and domestic violence. CI-1 is currently providing information for monetary compensation.  To date, CI-1 has been paid a total of approximately $5,200 by ATF for information provided to investigators.

**Controlled Purchase of Firearms and Fentanyl on January 30, 2025**

On January 30, 2025, agents with ATF and SDPD conducted another undercover operation. CAMPOS arranged to sell firearms and narcotics to CI-1 on that occasion. CI-1 and two ATF undercover agents (UCs) agreed to meet CAMPOS outside of his residence. Upon arrival at the deal location, CAMPOS was observed exiting the apartment complex, pulling a wagon and then approached the undercover vehicle (UCV). CAMPOS greeted CI-1 and the UCs and proceeded to put four firearms in the trunk of the UCV for CI-1 and the UCs to view and inspect.

Shortly thereafter, CAMPOS reentered the apartment building to retrieve narcotics to sell to the UCs and CI-1. CAMPOS exited the apartment building several minutes later holding a plastic bag.

In total, CAMPOS sold and delivered to CI-1 and the UCs the following: one Glock GMBH model: 21Gen4, .45 caliber pistol bearing serial number BLWR539, one Ruger model: P90, .45 caliber pistol bearing serial number 661-97284, one Sarsilmaz model: SAR 9X, 9-millmeter pistol bearing serial number T1102-21BV29046, one non-serialized, privately made (PMF) Glock-style pistol; one Machinegun Conversion device (MCD), one 17 Design & Manufacturing, LLC. model: 17DM-15, 5.56 caliber rifle bearing serial number 21-16422, approximately fifteen rounds of ammunition and approximately 501.29 grams of fentanyl pills in exchange for $8,600.

When the UC retrieved the PMF Glock-style pistol with the red MCD installed, CAMPOS stated the device did not convert the pistol to fire fully automatically. CAMPOS referred to the MCD as a safety lock.

As a result of CAMPOS' sales of narcotics to CI-1 and the UCs, ATF agents began working with Drug Enforcement Administration (DEA) San Diego agents on this investigation.

3

**Privately Made Firearms (PMFs)**

Privately made firearms (PMFs), in summary, are firearms that are not made by firearm manufacturers; instead, firearm manufacturers may sell individual buyers firearm parts, and that buyer uses various firearm drilling tools to construct and assemble the parts into a functional firearm. PMFs are also known as "ghost guns" because they are not serialized and, therefore, are untraceable.

**Machine Gun Conversion Devices**

Machinegun Conversion Devices (MCDs) are devices that can convert a Glock-type handgun to fire automatically, and thus the switches themselves are classified as "machineguns." See 26 U.S.C. § 5845(b) ("The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.") MCDs are illegal to possess under 18 U.S.C. § 922(o), and they are highly dangerous.

**Controlled Purchase of Fentanyl on May 7, 2025**

On May 7, 2025, agents with ATF conducted an undercover operation during which CAMPOS arranged to sell narcotics to CI-1 and a UC ATF agent.  CI-1 and CAMPOS agreed that they would again meet near CAMPOS' residence at the location of previous deals. During the deal, CAMPOS stated he would be receiving weekly shipments of firearms and would be taking special firearms orders. CAMPOS also stated he could acquire "SMG's" (submachineguns) and explained they were fully automatic firearms. Additionally, CAMPOS stated he could acquire 50 to 100 pounds of methamphetamine. On May 7th, CAMPOS sold the UC and CI-1 approximately 384.1 grams of fentanyl pills for $3,500. CAMPOS offered to sell the UC his personal firearm,

4

described by CAMPOS as a Glock 43 for $900, but told them it was located at his girlfriend's house in National City.   Therefore, the sale of the Glock 43 was not completed at that time.

**Controlled Purchase of Firearms, Fentanyl and Cocaine on May 14, 2025**

On May 14, 2025, agents with ATF and DEA conducted an undercover operation during which CAMPOS arranged to sell both firearms and narcotics to an ATF UC.  In advance of the deal, CAMPOS and the ATF UC discussed the purchases of the firearms. CAMPOS stated he would be traveling with this cousin the following day to meet his cousin's associate, who was in possession of the firearms. CAMPOS stated he could acquire ten firearms for the UC to purchase. On May 13, 2025, CAMPOS sent a message to the UC that he was scheduled to meet his cousin at 6:00 p.m. to travel to a "bodega". Based on my knowledge, training and experience, I know that the term "bodega" is commonly referred to as a stash house for either narcotics or firearms. At 10:00 p.m., CAMPOS forwarded the UC photographs of the firearms available for sale. The UC agreed to purchase two rifles and three pistols the following day.

On May 14th, CAMPOS sent a pinned drop location near his residence for the deal location.  CAMPOS called the UC and identified his vehicle as a gray Honda. Upon arrival at the deal location, the ATF UC observed CAMPOS and another Hispanic male standing by the trunk of the gray Honda. Both CAMPOS and the Hispanic male proceeded to transfer the firearms from the Honda to the undercover vehicle (UCV).

CAMPOS and the UC continued to discuss methamphetamine and firearms prices. When the UC inquired about cocaine, CAMPOS stated he deals "perico" (cocaine) and stated he had an ounce nearby available for sale.  The UC agreed to purchase the ounce for $800. Both CAMPOS and the Hispanic male entered the Honda and agents conducting surveillance observed the Honda driving towards CAMPOS' apartment building. Approximately ten minutes later, CAMPOS arrived back at the deal location without the Hispanic male. CAMPOS entered the UCV and proceeded to pull out the cocaine from his pocket. CAMPOS reiterated he was in the business of dealing cocaine

in the area and obtains cocaine from Mexico but must pay for the cocaine to be smuggled into the United States.

In total on May 14, 2025, the UC purchased one Glock, model 27 Gen 4, .40 caliber pistol, bearing serial number: BFBR756; one Glock, model 21 Gen 5, .45 caliber pistol, bearing serial number: BYWC041; one Glock, model 19 Gen 5, 9-millimeter pistol, bearing serial number: CBFM376; one American Tactical Imports, model Omni Hybrid, multi caliber pistol, bearing serial number: NS421787, one American Tactical Imports, model Omni Hybrid, multi caliber pistol, bearing serial number: NS421833, approximately sixty rounds of ammunition, approximately 518.9 grams of fentanyl pills and 29.8 grams of cocaine for $11,200.

### Controlled Purchase of a Firearm and Fentanyl on August 25, 2025

CAMPOS informed both CI-1 and UCs that he would be traveling out of the country for a few weeks from mid-June to mid-July. CAMPOS and the UC maintained communication during this time. From July 29, through August 11, 2025, the UC was unable to communicate with CAMPOS. During that time, CAMPOS changed his phone number. On August 14, 2025, CI-1 was able to acquire CAMPOS' new phone number. Utilizing the new phone number, the UC and CAMPOS were able to re-establish communication.

Between August 14, 2025, and August 25, 2025, the UC maintained communication with CAMPOS. CAMPOS stated he had a rifle and approximately 10,000 fentanyl pills available for the UC to purchase.

On August 25, 2025, a controlled purchase was organized for the UC to purchase 10,000 fentanyl pills and one firearm for $6,600 (USD) from CAMPOS. On the morning of the deal, CAMPOS informed the UC that he would be sending his "brother" (the Hispanic male who assisted CAMPOS during the May 14, 2025 controlled purchase) to conduct the deal during his lunch break. The deal was set to take place in the parking lot of the National City Golf Course.

6

Before the deal, units conducted surveillance in the vicinity of CAMPOS' residence. Agents observed CAMPOS exit the residence, holding a large cardboard box and greet the Hispanic male, who was standing alongside a white Acura sedan. CAMPOS then handed the cardboard box to the Hispanic male, who then placed the cardboard box inside the white Acura. Immediately after, CAMPOS entered a gray Honda and the Hispanic male entered the driver's seat of the white Acura. CAMPOS and the Hispanic male departed the area in their respective vehicles and drove towards the deal location.

Upon arriving, the Hispanic male entered the parking lot and parked in the parking stalls in front of the building at the golf course. Agents observed CAMPOS park on a side street overlooking the deal location. CAMPOS remained in his vehicle throughout the entirety of the deal.  Based on my knowledge, training and experience, I believe that CAMPOS remained there conducting counter surveillance.

When the UC arrived in the vicinity of the deal location, the UC observed the same Hispanic male standing near the white Acura. The Hispanic male removed the cardboard box from the Acura, walked towards the UC's vehicle and entered the front passenger seat.  The Hispanic male introduced himself to the UC and then proceeded to remove an AR-pistol from the cardboard box. The UC performed a function test of the firearm and asked if the firearm worked properly.  The Hispanic male stated that it did and told the UC that the firearm was new. The Hispanic male then proceeded to remove a clear plastic baggie containing small round blue pills. The UC purchased one American Tactical Imports, model Omni Hybrid, multi caliber pistol, bearing serial number: NS401028, and approximately 825.8 grams of fentanyl pills for $6,600.

### Additional Investigation

A query was submitted on December 4, 2024, to the California Department of Justice, Automated Firearms System (AFS) requesting a record for CAMPOS and received negative results.

7

Based on the information described herein, I believe that CAMPOS is trafficking firearms from Arizona to California based upon the purchased firearms from the above referenced undercover deals. The serialized firearms were purchased in Arizona, including one firearm bearing serial number BYWC041, purchased from the dealer seven days prior to being sold to the UC from CAMPOS.

| ATF Recovery Date | Firearm Serial Number | Purchase Date | Time to Crime (TTC) | Dealer | Dealer Location |
|---|---|---|---|---|---|
| 12/05/2024 | 00012004 | 07/24/2023 | 500 days | CG USA | Goodyear, AZ |
| 12/05/2024 | BLWR539 | 03/31/2020 | 1710 days | AZFIREARMS.com | Avondale, AZ |
| 12/05/2024 | A1-80858-20 | 03/13/2021 | 1363 days | Outlaw Larry's | Prescott Valley, AZ |
| 01/30/2025 | 21-16422 | 04/02/2024 | 303 days | Estrella Ordinance | Goodyear, AZ |
| 01/30/2025 | 661-97284 | 09/09/2014 | 3796 days | Pawn 1st LLC | Phoenix, AZ |
| 01/30/2025 | T1102-21BV29046 | 11/27/2024 | 64 days | MMP Guns | Phoenix, AZ |
| 05/14/2025 | BFBR756 | 04/10/2025 | 34 days | USA Pawn and Jewelry | Tucson, AZ |
| 05/14/2025 | BYWC041 | 05/07/2025 | 7 days | USA Pawn & Jewelry | Tucson, AZ |
| 05/14/2025 | CBFM376 | 12/16/2023 | 515 days | SNG Tactical LLC | Tucson, AZ |
| 05/14/2025 | NS421787 | 11/09/2024 | 186 days | Friendly Thrift and Pawn | Phoenix, AZ |
| 05/14/2025 | NS421833 | 11/09/2024 | 186 days | Friendly Thrift and Pawn | Phoenix, AZ |
| 08/25/2025 | NS401028 | 11/09/2024 | 289 days | Friendly Thrift and Pawn | Phoenix, AZ |

### ATF Analysis of Machinegun Conversion Device

A firearms enforcement officer ("FEO") with the ATF Firearms & Ammunition Technology Division ("FATD"), trained and experienced in determining whether firearms fall under the National Firearms Act ("NFA"), examined and tested the

8

suspected MCD from the January 30, 2025, controlled purchase. The FEO reported that he test-fired the suspected machinegun and partially disassembled the firearm for examination. When the FEO test-fired the suspected MCD installed on a semiautomatic pistol, each round fired semiautomatically. The FEO repeated this test several times with the pistol never firing automatically. Based on his examination of the MCD, the FEO determined that the MCD is a machinegun because the sole purpose of this device is to enable automatic fire by preventing the cruciform from retaining the firing pin and the MCD is a combination of parts designed and intended for use in converting a weapon into a machinegun.  Accordingly, as defined in 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b), the device is a machinegun.

### National Firearms Registration and Transfer Record

Based upon my training and experience, I know that National Firearms Act (NFA) firearms are restricted firearms and other devices regulated by the NFA. One category of these restricted firearms are machineguns. These items are only sold by specially licensed Federal Firearms License (FFL) dealers with a Class 3 Special Occupational Tax permit. An FFL is a license in the United States that enables an individual or company to engage in a business pertaining to the manufacture or importation of firearms and ammunition, or the interstate and intrastate sale of firearms. To lawfully possess or transfer NFA firearms, the NFA firearm must be registered to the possessing or transferring individual in the National Firearms Registration and Transfer Record. After having checked ATF records, the defendant ELIUD CAMPOS JR. is not a licensed FFL dealer nor does he have a Class 3 Special Occupational Tax permit, and the Machinegun discussed herein is not registered to CAMPOS in the National Firearms Registration and Transfer Record. Accordingly, at all times material to the facts and Complaint here, CAMPOS has been prohibited from selling firearms, including, but not limited to, machineguns.

9